**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **DAX J. BERGERON** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **No. 13-6128** |
| | * | |
| **RELIASTAR LIFE INSURANCE COMPANY** | * | **SECTION "L" (4)** |

**ORDER & REASONS**

Before the Court is Plaintiff Dax Bergeron's Motion for Judgment Based on the Administrative Record (Rec. Doc. 22) and Defendant ReliaStar Life Insurance Company's Motion for Judgment Based on the Administrative Record (Rec. Doc. 24). The Court has reviewed the parties' briefs and the applicable law and now issues this Order & Reasons.

## I. PROCEDURAL BACKGROUND

Plaintiff Dax Bergeron began working as a process technician for Lyon Copolmeyer, a rubber manufacturing company, on October 3, 2011[1]. (Bergeron_563)[2]. The job was physically demanding and required Bergeron to lift objects weighing anywhere from seventy to eighty-five pounds. (Bergeron_185). The position also required Bergeron to maintain the ability to lift and carry up to ninety pounds; to climb ladders; to carry material up several flights of stairs; to perform scaffolding; to stand and walk for long periods of time; to handle control valves up to a hundred pounds; and to hang and rig chain falls or come-a-longs. (Bergeron_403).

Plaintiff alleges he became disabled during the course of his employment and seeks permanent disability benefits under this employer's group disability policy. His claim has been

[1] Bergeron's Affidavit, Bergeron_184, states that Bergeron started working on October 23, 2014. The Short Term disability Form, Bergeron_563, indicates a start date of October 3, 2014. The Court will rely on the Short Term disability Form and afford Bergeron an additional twenty working-days.
[2] When referencing the Administrative Record, Rec. Doc. 19, the Court will use the provided Bates Stamps. These Bates Stamps are located in the bottom, right corner of every page and are numbered Bergeron_001-Bergeron_596.



AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

administratively denied, and he brings this suit under ERISA seeking relief from the administrative denial.

## II. FINDINGS OF FACT

Lyon Copolymer, Bergeron's employer, provides Group Long Term disability insurance to its employees through an insurance policy insured by Defendant ReliaStar Insurance Company ("ReliaStar"). Bergeron's plan for Long Term disability benefits states:

> [to] qualify for benefits, all of the following conditions must be met:
>
> You must-
> - be insured on the date you become disabled and the condition causing your disability is not excluded from coverage.
> - Be insured on the date the benefit waiting period begins.
> - Send written notice of the disability as described in the Claim Procedures Section.
> - be receiving regular and appropriate care and treatment.

(Bergeron_420).

The plan defines "disability, disabled" as

> ReliaStar Life's determination that a change in your functional capacity to work due to accidental injury or sickness has caused the following:
> - During the benefit waiting period and the following 24 months, your inability to perform the essential duties of your regular occupation and as a result you are unable to earn more than 80% of your indexed monthly earnings.
> - After 24 months of benefits, your inability to perform the essential duties of any gainful occupation, and as a result you are unable to earn more than 60% of your indexed basic monthly earnings.

(Bergeron_431).

The plan provides the following pre-existing condition exclusion for Long Term disability benefits: "ReliaStar [ ] will not pay Monthly Income benefits if your disability is due to a pre-existing condition, and you become disabled during the first 12 months your Insurance is in effect." (Bergeron_423). A pre-existing condition is defined as

> A sickness or accidental injury for which, during the 3 months immediately before the effective date of your insurance or increased amount of insurance, you did one or more of these:
>
> - Received medical treatment, care, services or advice.
> - Took prescribed drugs or had medications prescribed.
> - Experienced related or resulting symptoms or aggravations which would be a reasonable cause for an ordinarily prudent person to seek diagnosis, care or treatment from a doctor or health care disability.

(Bergeron_433). The plan defines the "period of disability:"

> [A] new period of disability begins if the new disability results from a cause or causes unrelated to that of any previous disability, separated by active work with the Policyholder. All periods of disability which have the same cause are considered one period of disability.

(Bergeron_433). "Active work, actively at work" occurs if

> The employee is physically present at his or her customary place of employment with the intent and ability of working the scheduled hours and doing the normal duties of his or her job on that day.

(Bergeron_431).

Bergeron began his employment with Lyon Copolymer in October of 2011 and became eligible for disability coverage under the group policy on November 2, 2011. He stopped working eight days later, on November 10, 2011 and applied for Short Term disability benefits, listing "abdominal pain" as the cause of his disability. (Bergeron_563). As part of Bergeron's claim submission, Dr. Dhaval Adhvaryu, M.D., completed the Attending Physician's Statement of Impairment and Function and noted "abdominal pain" as the only subjective symptom and the primary diagnosis. (Bergeron_572).

Bergeron indicated on his Short Term disability claim that he had experienced abdominal pain before. (Bergeron_569). He noted that Dr. Adhvaryu had treated him in approximately July 2011. (Bergeron_569). Indeed, Dr. Adhvaryu initially saw Bergeron on June 24, 2011 after Dr. Joseph Nesheiwat referred Bergeron to Dr. Adhvaryu. (Bergeron_372). On that occasion,

Bergeron presented to Dr. Adhvaryu with right abdominal pain as the primary reason for the consultation. (Bergeron_372). Bergeron noted he had experienced abdominal pain for three months with nausea and alternating constipation and diarrhea. (Bergeron_372). Dr. Adhvaryu's notes from the physical examination indicate that Bergeron was alert, oriented and had normal memory function. (Bergeron_373).

On August 2, 2011, Bergeron underwent a high-resolution esophageal motility study. (Bergeron 300). On August 9, 2011, Diane Dunston, a certified family nurse practitioner, saw and evaluated Bergeron. Dunston noted that Bergeron "was last here in 2005 for abdominal pain with a negative work up at that time." (Bergeron_271). She went on to say that "[t]oday he reports recurrent right upper quadrant pain which is being followed by Dr. Adhvaryu." (Bergeron_271). Bergeron also complained of "alternating bowel habits between diarrhea and constipation." (Bergeron_271). Dunston recommended that Bergeron schedule an esophagogastroduodenoscopy and continue the Nexium recommended by Dr. Adhvaryu. (Bergeron_272). Dunston also prescribed Bentyl for the abdominal pain. (Bergeron_272).

Dr. Nesheiwat saw Bergeron on August, 15, 2011 and noted that the visit was a "follow up" and that the "RUQ [right upper quadrant] pain is really bad." (Bergeron_344). Dr. Nesheiwat noted that Bergeron suffered from fatigue but no memory loss and demonstrated a normal gait. (Bergeron_344-45). Dr. Nesheiwat recommended that Bergeron complete his RUQ pain evaluation and resume TNF therapy after the RUQ is sorted out. (Bergeron 346).

Bergeron had a contrast CT scan of his abdomen and pelvis on November 10, 2011, the day he stopped working. (Bergeron_519). The scan revealed no acute inflammatory changes within the abdomen but found a small, 1 cm enhancing lesion at the dome of the liver and the gallbladder to be contracted. (Bergeron_519).

As noted earlier, Bergeron visited Dr. Adhvaryu again on November 15, 2011. (Bergeron_368). After noting that Bergeron had experienced RUQ pain since April 2011, Dr. Adhvaryu recorded that Bergeron suffered from back pain, back stiffness, and joint pain. (Bergeron_368-69). Dr. Adhvaryu also noted that Bergeron did not suffer from fatigue or joint swelling; showed no limitation of joint movement, confusion, or memory loss; and his gait and eyes were normal. (Bergeron_369).

Dr. Adhvaryu completed Bergeron's Attending Physician's Statement of Impairment and Function on December 9, 2011. (Bergeron_574). Dr. Adhvaryu failed to complete the section detailing the extent of Bergeron's disability and whether or not Bergeron could work. (Bergeron_572-74). Dr. Adhvaryu also indicated that Bergeron's November 15, 2011 visit signified his first visit, but Dr. Adhvaryu's records indicate otherwise, as already outlined in this this section. Dr. Adhvaryu saw Bergeron again on November 29, 2011 for a checkup and indicated that Bergeron was suffering from RUQ abdominal pain and diarrhea. (Bergeron_367). Dr. Adhvaryu noted that Bergeron was having no difficulty walking or sitting and also concluded that he was "[n]ot sure what [was] causing his pain." (Bergeron_367).

Bergeron saw Dr. Joseph Nesheiwat on December 2, 2011, and Dr. Nesheiwat recorded Bergeron's chief complaint was "right side pain/lymph nodes swollen under left arm/b/a's dizziness." (Bergeron_338). Dr. Neshewiat also noted that Bergeron was "alert, oriented, cooperative [with] affect normal" and presented with a normal gait. (Bergeron_339). Dr. Neshewiat concluded that he was "at a loss for what causes Dax's pain." (Bergeron_339).

Dr. Andrew Nelson, a gastroenterologist, recorded in a letter dated December 13, 2011 that Bergeron had "c[o]me in to the office over the last few months to be evaluated for abdominal pain. The patient had been complaining of recurrent right upper quadrant abdominal

pain and [is] being followed by his surgeon (Dr. Adhvaryu)." (Bergeron_270). Dr. Nelson also noted that Bergeron "had an extensive work up done including gastrict emptying study, tweny-four hour pH probe, and an empiric trial of proton pump inhibitor." (Bergeron_270). Dr. Nelson had ordered an upper endoscopy "which revealed no significant disease." (Bergeron_270). Bergeron went to Dr. Nelson on December 5, 2011 with complaints of pain in his right side. (Bergeron_270). Dr. Nelson concluded his letter by saying that he could not think of any explanation for Bergeron's symptoms and referred him to Tulane for a second opinion. (Bergeron_270).

Bergeron saw Dr. Michael Green, M.D., on December 19, 2011 for an upper respiratory infection. (Bergeron_252). Bergeron also complained of fatigue. (Bergeron_253). Dr. Green referred Bergeron to a neurologist.

On January 10, 2012, Dr. Joseph Buell, M.D., of Tulane University Hospital and Clinic, saw and evaluated Bergeron. (Bergeron_474). Dr. Buell noted that Bergeron had been out of work for several months due to abdominal pain. (Bergeron_474). Dr. Buell reviewed Bergeron's CT scan and MRI and concluded that he had a "hypervascular mass in the posterior aspect of his liver on CR scan as well as [an] atypical mass on MRI." (Bergeron_474). Dr. Buell found this to be "consistent with adenoma and concerning for his abdominal pain." (Bergeron_474). Bergeron relayed to Dr. Buell that he was fatigued and felt poorly due to his abdominal pain but denied any nausea, vomiting, diarrhea, or musculoskeletal issues. (Bergeron_474). Dr. Buell concluded that Bergeron suffered from a right, posterior lesion consistent with hepatocellular adenoma and that the lesion was likely the cause of Bergeron's abdominal pain. (Bergeron_475).

Dr. Buell performed a procedure to remove the liver mass on January 26, 2012. (Bergeron_477). Dr. Buell submitted an Attending Physician's Statement of Impairment and Function on January 31, 2012. (Bergeron_505). In the section entitled "Extent of Disability," Dr. Buell recorded that Bergeron was not totally disabled and anticipated a release to Bergeron's occupation. (Bergeron_506). Dr. Buell also noted that he anticipated a "release to a less physically and/or emotionally demanding occupation" three to six weeks post-operation. (Bergeron_506). Following the procedure, Dr. Buell also prepared a Clinic Progress note on February 7, 2012 and relayed that post-operation Bergeron's "deep abdominal pain [was] completely resolved." (Bergeron_498). Dr. Buell went on to note that he believed Bergeron was "improving greatly" and found that he had "made great strides in last week since discharge." (Bergeron_498).

Bergeron visited Dr. Buell on March 13, 2012 and again complained of RUQ pain. (Bergeron_317). Bergeron relayed that he had occasional headaches and tremors and suffered from shortness of breath. (Bergeron_317). Dr. Buell recorded that Bergeron "appear[ed] well though depressed." (Bergeron_317). In the section of his notes entitled "assessment and plan," Dr. Buell noted that Bergeron appeared to have chronic abdominal pain that was of "uncertain etiology." (Bergeron_317). Dr. Buell noted that an outside physician had conducted a HIDA scan, which returned negative. (Bergeron_317). Dr. Buell discussed performing a laparoscopic cholectsystectomy. Dr. Buell recorded that "[t]his may or may not be associated with his current disease process, however, going down the road of abdominal pain and 'inability to work,' even though he appears fit, I believe is associated with his depression." (Bergeron_317).

Approximately two weeks later, on March 29, 2012, Bergeron visited the emergency room at Baton Rouge General Medical Center and complained of RUQ abdominal pain.

(Bergeron_311). Dr. David Mallon, MD, examined Bergeron and noted that his eyes appeared normal and exhibited no motor deficit. (Bergeron_312). Dr. Mallon included in his progress notes that Bergeron had an EGD (Esophagogastroduodenoscopy, a test to examine the lining of the esophagus, stomach, and first part of the small intestine) performed the prior day that was negative. Dr. Mallon noted that he had spoken with Dr. Nelson and urged Bergeron to follow up with Dr. Buell. (Bergeron_312). Dr. Mallon listed abdominal pain as Bergeron's primary diagnosis. (Bergeron_313). On May 2, 2012, Bergeron underwent a procedure to have his gallbladder removed (laparoscopic cholectsystectomy). (Bergeron_7; 51). ReliaStar continued to pay Bergeron's Short Term disability benefits until the coverage reached its maximum duration on May 11, 2012. (Bergeron_443). Bergeron then filed a claim for Long Term disability benefits based on his abdominal pain. ReliaStar acknowledged receipt of Bergeron's Long Term disability claim in a letter dated May 11, 2012.

Bergeron visited Dr. Michael Green, M.D., on May 14, 2012 with complaints of "generalized abdominal pain" located in the RUQ with associated symptoms of diarrhea, nausea, and problems with urinary retention. (Bergeron_249). Bergeron also complained of fatigue. (Bergeron_250). Dr. Green noted that Bergeron's eyes were normal; he presented with a normal gait; and he was alert and oriented. (Bergeron_250). Dr. Green concluded that Bergeron had generalized abdominal pain. (Bergeron_251).

Dr. Green referred Bergeron to Dr. David Hastings, a M.D. urologist, on May 17, 2012. (Bergeron_260). Bergeron presented to Dr. Hastings with a chief complaint of slow stream urination and a painful testicle and relayed that he had experienced the slow stream for approximately a year. (Bergeron_260). Dr. Hastings noted Bergeron did not complain of blurred vision, pain in the eyes, or double vision. (Bergeron_261). Bergeron relayed that he

had not experienced tremors, numbness/tingling, or dizzy spells and appeared alert and oriented. (Bergeron_261). Bergeron indicated that he did not suffer arthritis, bone, or joint pain. (Bergerno_261). Dr. Hastings recorded that Bergeron's gait appeared normal. (Bergeron_261).

On June 22, 2012, ReliaStar informed Bergeron via letter that ReliaStar was denying his Long Term disability claim because Bergeron's claimed disability of abdominal pain fell within the pre-existing condition exclusion. (Bergeron_234-235). Under Bergeron's plan, he became eligible for Long Term disability benefits when his Short Term disability benefits lapsed, which was a maximum of 180 days after receipt of benefits commenced. (Bergeron_416). Bergeron's Short Term disability plan did not include a pre-existing existing exclusion condition, but it was applicable to his Long Term disability claim. (*See* Bergeron_503-504; 423).

In the letter denying Long Term disability benefits, ReliaStar explained its position by noting that Bergeron's effective date of coverage was 11/2/2011 (one month after employment commenced), so the appropriate look-back period extended from 8/2/2011 until 11/2/2011. (Bergeron_235). ReliaStar noted that Bergeon had seen Diana Diston, CFNP, at gastroenterology associates on August 9, 2011 after a referral from Dr. Adhvaryu for RUQ abdominal pain. (Bergeron_235). ReliaStar also noted that Bergron saw Dr. Adhvaryu on June 24, 2011 for treatment of abdominal complaints beginning three months prior. (Bergeron_235). Finally, ReliaStar stated that Dr. Nesheiwat saw Bergeron on August 15, 2011 for severe right upper quadrant pain. (Bergeron_235). ReliaStar concluded that since Bergeron "received medical treatment, care, service or advice, and took prescribed drugs during the look-back period" for his claimed impairment of abdominal pain, he was not eligible for Long Term disability benefits. (Bergeron_235).

Bergeron appealed ReliaStar's denial of his Long Term disability benefits on December 19, 2012. (Bergeron_182-83). Bergeron's appeal included a letter from his attorney, an affidavit prepared by Bergeron, and medical records from Dr. April Erwin, M.D. In his letter, Bergeron's attorney argued that Bergeron took disability because of abdominal pain, fatigue, and pain throughout his body, and that the fatigue and pain arose after the look-back period and therefore did not qualify as pre-existing conditions. (Bergeron_183). Bergeron's attorney also argued that Dr. Erwin's medical records showed that Dr. Erwin had diagnosed Bergeron with demyelinating disease of the central nervous system. (Bergeron_183). Bergeron's attorney avers that the demyelinating disease is separate from the abdominal pain and therefore does not fall within the pre-existing condition exclusion. (Bergeron_183). Alternatively, Bergeron's attorney argues that the preexisting condition should not apply because doctors have not been able to cure Bergeron's abdominal pain and doctors therefore did not know what his condition was during the look-back period. (Bergeron_183).

In his accompanying affidavit, Bergeron stated that he took disability due to "severe abdominal pain, chronic pain throughout my extremities, memory problems, poor eyesight, and fatigue, diarrhea, and constipation." (Bergeron_184). He stated that the symptoms, save the abdominal pain, "came on gradually beginning in November 2011." (Bergeron_184). He noted that he did not list any of the conditions, except for the abdominal pain, on his Short Term disability application but explained that this was due to a lack of room on the application and because he did not anticipate that ReliaStar would deny his application for Long Term disability due to a preexisting condition exclusion. (Bergeron_184). Bergeron stated that "[h]ad I known that such an exclusion existed, I probably would have taken more time to complete my application more thoroughly." (Bergeron_184).

Bergeron included a letter from Dr. Erwin that stated that Bergeron was under Dr. Erwin's care for demyelinating disease of the central nervous system.[3] (Bergeron_185). Dr. Erwin stated that Bergeron was unable to fulfill his employment duties because of the symptoms recorded in her office notes, and that those symptoms/complaints were unrelated to the abdominal pain Bergeron complained of in the past. (Bergeron_185).

As support for Dr. Erwin's assertions, Bergeron provided medical records from his visits to Dr. Erwin. The first visit occurred on September 6, 2012. (Bergeron_187). In the office notes entitled "History of Present Illness," Dr. Erwin noted that Bergeron had experienced memory loss over a long period of time, possibly five years. (Bergeron_187). Dr. Erwin also recorded that Bergeron fatigues easily and had experienced muscle cramping, spasms, and hand tremors. (Bergeron_187). She noted that he had blurred vision with pain and pressure. (Bergeron_187). Dr. Erwin performed a physical exam and recorded that the "conjunctiva and sciera [of his eyes were] clear" and that his gait was normal. (Bergeron_188). In the section entitled "Impression and Recommendations," Dr. Erwin noted a "mild cognitive impairment so stated." (Bergeron_190). Under this diagnosis, Dr. Erwin wrote:

> Mr. Bergeron has a constellation of neurologic symptoms over time without a clear diagnosis. His neurologic exam today does not show any findings of concern. We looked at his MRI together in clinic today, and there were no lesions which would lead to a definitive diagnosis of MS. At this time, it is difficult to sort out which complaints might be residuals of his cervical spine problems, and which problems could relate to an inflammatory process in the central nervous system. For now, we will focus on further evaluating the patient's perceived cognitive impairment since many of his somatic complaints have been fully evaluated with testing. Cognitive testing will identify any mood disorder which is contributing to the patient's symptoms. On average, a patient with untreated MS will develop 11 new lesions every 12-18 months. Therefore, we will image the patient again in a few months. If new lesions are present, we will be able to make a diagnosis. If not, we will continue to follow the patient and treat him symptomatically.

[3] MS is the most common type of demyelinating disease of the central nervous system.

(Bergeron_190).

Bergeron went to Dr. Erwin for a follow-up visit on October 16, 2012 to treat a rash. During that visit, Bergeron complained of fatigue, weakness, eye blurring, diarrhea, constipation, abdominal pain, joint pain, muscle cramps, muscle weakness, stiffness, and arthritis. (Bergeron_193). He also complained of memory loss. (Bergeron_194).

As further support for his appeal, Bergeron included records from his visit to psychologist, Dr. Paul Dammers, PhD MP, who works at the same NeuroMedical Center Clinic as Dr. Erwin. Dr. Dammers evaluated Bergeron on November 26, 2012 and administered a MMPI-2 to Bergeron. Dr. Dammers recorded that Bergeron had a normal gait. (Bergeron_217). Dr. Dammers concluded that Bergeron suffered from (1) depression/anxiety; (2) a pain disorder associated with psychological issues and general medical condition; (3) insomnia related to Axis I disorder; and (4) a cognitive disorder. (Bergeron_217-218). Under the depression/anxiety diagnosis, Dr. Dammers noted Bergeron's "emotional symptoms seem grossly exaggerated on MMPI-2, but no acute distress and no evidence of distress on clinical presentation." (Bergeron_218). Dr. Dammers recorded under the cognitive disorder diagnoses that Bergeron had "some relative/varied problems with learning/memory on formal testing, more of an acquisition problem than a problem of delayed recall. This could relate to his mood/pain ? fibromyalgia." (Bergeron_218).

Dr. Erwin saw Bergeron again on December 6, 2012 and noted that Bergeron presented to the clinic for "follow-up of his probable demyelinating disease." (Bergeron_197). Bergeron again complained of fatigue, eye blurring, nausea, diarrhea, constipation, abdominal pain, joint pain, muscle cramps, muscle weakness, arthritis, tingling, numbness, and memory loss. (Bergeron_198-199). He also complained of tremors. (Bergeron_199). Dr. Erwin noted that

Bergeron's "extraocular movements are intact [and] [v]isual fields are full to visual confrontation," and he presented with a normal gait and no tremors. (Bergeron_200). In the section titled "Impression and Recommendations," Dr. Erwin stated that Bergeron suffered from (1) mild cognitive impairment so stated and (2) parathesia. (Bergeron_200-201). Under "mild cognitive impairment so stated," Dr. Erwin noted that "results of cognitive testing showed some difficulties with short-term memory and learning new information. The cognitive difficulties and right torso pain are the main issues preventing the patient from returning to work….I would like to obtain…a new MRI brain to look for any additional demyelinating-type lesions." (Bergeron_200).

ReliaStar denied Bergeron's appeal for Long Term disability benefits in a letter dated February 5, 2013. (Bergeron_156). In the letter, ReliaStar emphasized that Bergeron stated that the cause for his Long Term disability, on November 22, 2011, was abdominal pain and that Dr. Adhvaryu's Attending Physician Statement also reflected this sole diagnosis. ReliaStar relied on Dr. Russell Stewart's ReliaStar Independent Medical Exam ("IME") of Bergeron's medical records (Bergeron_160-165) to conclude that (1) Bergeron was not disabled on November 11, 2011 due to abdominal pain or due to demyelinating disease; and (2) if the abdominal pain did qualify as a Long Term disabling condition, it fell within the pre-existing condition exclusion and was not covered. (Bergeron_158).

Dr. Russell is Board Certified in Occupational Medicine and is an independent disability consultant for Unum Insurance Company. (Bergeron_61). Dr. Russell reviewed the medical records provided by Dr. Erin, Dr. Dammers, Dr. Green, Dr. Hastings, Dr. Nelson/ Dunston, Dr. Buell, Dr. Malazai/Stein Dr. Nesheiwat, Dr. Boudreaux, and Dr. Adhvaryu. (Bergeron_161).

Dr. Russell provided a thorough chronology of these records in his assessment. (Bergeron_161-164).

In his analysis, Dr. Russell concluded that Bergeron "had complained of, been evaluated for, and received treatment (including attempts to evaluate the stomach, duodenum and colon) for right upper quadrant abdominal pain during the period of 8/2/2011-11/2/2011," which was the relevant time period for whether the disabling condition qualified as a pre-existing condition. (Bergeron_164). Dr. Russell concluded that Bergeron had been disabled due to abdominal pain on two occasions: (1) six days after his surgery on January 26, 2012; (2) twenty-eight days following the procedure to remove his gallbladder. (Bergeron_164). Bergeron qualified for and received Short Term disability payments during this period. Dr. Russell noted that "[m]ore than likely, concomitant behavioral health conditions was adversely affecting his pain presentation." (Bergeron_164).

Dr. Russell disagreed with Bergeron's assertion that he suffered from demyelinating disease with the symptoms first presenting during his insurance eligibility period. (Bergeron_164). Specifically, Dr. Russell concluded that

> The insured does not meet the McDonald criteria for multiple sclerosis and does not have physical signs of a demyelinating condition on physical exam. Again, he has symptoms without any physical signs, abnormal imaging studies, abnormal EEG or evoked potentials, abnormal spinal fluid examination, or evidence of disease progression without treatment. There is no evidence to support a neurological condition.

(Bergeron_164). Dr. Russell also noted that Bergeron had "told Dr. Erwin he has had short-term memory issues for at least 5 years." (Bergeron_164).

Bergeron's counsel sent a letter dated April 5, 2013 to ReliaStar requesting that their appeals determination be reversed. (Bergeron_82-84). Bergeron's counsel averred that Dr. Russell's IME was inconsistent with Bergeron's medical records as Bergeron's medical records

demonstrated significant signs of MS or demyelinating disease. (Bergeron_82-83). Bergeron's counsel noted that Bergeron displayed a worsening gait and that Dr. Erwin had ordered a three-day outpatient IV steroid treatment to control his nerve inflammation and treat this condition. (Bergeron_83). Bergeron's counsel also argued that Bergeron displayed several other symptoms of demyelinating disease,

> including impaired vision, pain throughout his entire body, lesions on his brain shown in an MRI, decreasing ability to walk (which led to a three-day outpatient procedure in which he was given an IV for steroids that reduced his inflammation), tingling numbness in all of his extremities, tremors. His tongue and lips have gone numb and tingle.

(Bergeron_83). Bergeron's counsel emphasized that Dr. Russell had made no effort to contact Dr. Erwin and has worked as an in-house doctor for Unum Provident, a disability insurer with a history of biased claims determinations. (Bergeron_83). Focusing on Dr. Russell, Bergeron's counsel cited two cases where Dr. Russell gave opinions that Unum relied on to deny benefits to claimants and ReliaStar should therefore question the impartiality of Dr. Russell's opinion. (Bergeron_83). Bergeron's counsel also noted that Bergeron had seen Dr. Couvillion, a retinal specialist, who performed an angiogram and Dr. Couvillion had told Bergeron that Dr. Couvillion believes Bergeron suffers from MS. (Bergeron_83). Finally, Bergeron's counsel averred that the records showed lesions on Bergeron's brains and attached medical literature on MS. (Bergeron_84). Bergeron's counsel also included his MRI results.

Bergeron's counsel forwarded additional records from Bergeron's eye specialist to ReliaStar on April 18, 2013. (Bergeron_54). Those records indicate that Dr. Erwin referred Bergeron to this eye specialist for possible MS and that Bergeron visited the specialist on March 28, 2013. (Bergeron_55-56). The notes state that Bergeron has experienced blurred spots in the

last year and floaters come and go. (Bergeron_55). Under diagnosis and impressions, the specialist wrote "?MS". (Bergeron_56).

ReliaStar denied Bergeron's second appeal on May 22, 2013, finding that the original and appeal determinations were in accordance with ReliaStar policy. (Bergeron_33). ReliaStar relied on and included another review by Dr. Russell. (Bergeron_35). Dr. Russell again noted that Bergeron had been disabled due to abdominal pain on two occasions, when he underwent surgery on January 26, 2012 and on May 2, 2012. (Bergeron_47). Dr. Russell also recorded that Bergeron's Long Term disability claim was subject to the pre-existing condition exclusion because Bergeron had sought treatment for this condition in the months preceding his policy's start date. (Bergeron_47). Dr. Russell noted that he did not diagnose Bergeron with somatoform disorder but that Dr. Dammers, a colleague of Dr. Erwin, had made this diagnosis as a possible explanation for why Bergeron's abdominal pain did not improve with treatment. (Bergeron_47).

Regarding Bergeron's assertions that his disabling condition stems from demyelinating disease, Dr. Russell stated that "in [his] opinion, the neurological diagnosis is still up in the air." (Bergeron_48). Dr. Russell concluded that the arguments and materials provided by Bergeron's counsel did not change his prior conclusions. (Bergeron_48). As support for this statement, Dr. Russell noted that Dr. Erwin and Dr. Patel did not provide any physical or neurological examination findings, but rather, both doctors had added diagnoses without providing any foundation for those determinations. (Bergeron_48). Although Bergeron's counsel averred that Bergeron had received an IV steroid treatment and that his condition had subsequently improved, thus confirming an MS diagnosis, Dr. Russell disagreed and noted that nothing in the record indicated what symptoms the steroids were given to treat. (Bergeron_48). Moreover, Dr. Russell contended that many people feel better after a steroid treatment, and such improvement

does not confirm a neurological diagnosis. (Bergeron_48). Dr. Russell also rejected Bergeron's counsel's assertion that Bergeron did not include any demyelinating symptoms in his disability application due to a lack of space on the form. Dr. Russell counters that neither Dr. Andrew nor Dr. Nesheiwat noted these symptoms in their office notes during the relevant time period, from August, 2, 2011 to November 2, 2011. (Bergeron_48).

ReliaStar relied on Dr. Russell's findings and stated in its letter to Bergeron, dated May 22, 2013, that ReliaStar concluded that on November 11, 2011 (the date Bergeron began Short Term disability) Bergeron did not suffer from a condition that caused Long Term, total disability. ReliaStar argued that even if Bergeron had experienced related or resulting symptoms during the period between August 2, 2011 and November 2, 2011, Bergeron would still be excluded from coverage since an ordinarily prudent person would have sought diagnosis or treatment for such symptoms and he did not. (Bergeron_36). Accordingly, ReliaStar held that Bergeron was not eligible for Long Term disability benefits. (Bergeron_36).

## III. CONCLUSIONS OF LAW

### A. Standard of Review

Under ERISA, Federal courts have exclusive jurisdiction to review determinations made by employee benefit plans, including disability benefit plans. 29 U.S.C. § 1132(a)(1)(B). A district court must limit its review to an analysis of the administrative record. *Vega v. Nat. Life Ins. Services, Inc.*, 188 F.3d 287, 300 (5th Cir. 1999). "[A] denial of benefits challenged under § 1132(a)(1)(B) is generally reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115

(1989). "[W]hen an administrator has discretionary authority with respect to the decision at issue, the standard of review should be one of abuse of discretion." *Vega*, 188 F.3d at 295.

In the instant case, the plan states "ReliaStar Life has final discretionary authority to determine all questions of eligibility and status and to interpret and construe the terms of this policy(ies) of insurance." (Bergeron_593). Accordingly, the Court must apply an abuse of discretion standard to its review of the plan administrator's decision.

Under this deferential standard, a plan's fiduciary determination will be upheld so long as it is "supported by substantial evidence and is not arbitrary and capricious." *Corry v. Liberty Life Assur. Co. of Boston*, 499 F.3d 389, 397-98 (5th Cir. 2007). The Fifth Circuit has explained that "[s]ubstantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004). Under this standard, a decision is arbitrary and capricious if it is made "without a rational connection between the known facts and the decision or between the found facts and the evidence." *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 214 (5th Cir. 1999). "[R]eview of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on the continuum of reasonableness—even if on the low end." *Corry v. Liberty Life Assur. Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007) (quoting *Vega*, 188 F.3d at 297).

Bergeron suggests that the Court should apply a different standard because a conflict of interest exists because ReliaStar is economically incentivized to deny benefits and ReliaStar's expert has a history of biased claims. "[W]hen judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is

one." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008). Weighing a conflict of interest does not "impl[y] a change in the standard of review, say, from deferential to *de novo*." *Id.* at 115. "Quite simply, 'conflicts are but one factor among many that a reviewing judge must take into account,'" and "the specific facts of the conflict will dictate its importance." *Holland v. Int'l Paper Co. Retirement Plan*, 576 F.3d 240, 247-48 (quoting *Glenn* 554 U.S. at 117). "In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific performance." *Glenn* 554 U.S. at 117.

> A conflict of interest should prove more important…where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy.

*Glenn* 554 U.S. at 117. A court may afford more weight to a conflict of interest when the process employed to render the denied claim indicates "procedural unreasonableness." *Id.* 118. *See Schexnayder v. Hartford Life & Accident Ins. Co.*, 600 F.3d 465, 469 (5th Cir. 2010) ("[A] reviewing court may give more weight to a conflict of interest, where the circumstances surrounding the plan administrator's decision suggest 'procedural unreasonableness.'"). Procedural unreasonableness describes the situation where "the method by which the plan administrator made the decision was unreasonable." *Truitt v. Unum Life Ins. Co. of America*, 729 F.3d 497, 510 (5th Cir. 2013).

The Fifth Circuit found a conflict of interest to be a minimal factor when a structural conflict of interest existed, but the conflict did not result in any economically-driven motivation to deny claims and the administrator took other steps to minimize conflict. *Holland*, 576 F.3d at 249. These steps included relying on the opinions of independent medical professionals when

deciding claims. *Id.* Conversely, the Fifth Circuit weighed the conflict of interest factor more heavily when an administrator both administered and paid for the plan, and the benefits *did* affect the administrator's bottom line because the benefit payments came directly from the administrator and the administrator took no steps to minimize that conflict. *Schexnayder*, 600 F.3d at 470. In *Schexnayder*, the Fifth Circuit noted that "circumstances suggest[ed] procedural unreasonableness" because of the administrator's failure to address the Social Security Administration award in its denial letters, and this procedural unreasonableness justified the court in weighing the conflict as a more significant factor." *Id.* at 471. In another case, the Fifth Circuit found that a conflicted administrator's failure to reasonably investigate a claim did not signify procedural unreasonableness because there is no duty to investigate. *Truitt* 729 F.3d 497 at 511.

Here, ReliaStar concedes that a structural conflict of interest exists but argues that Bergeron fails to allege any specific facts regarding the extent of that conflict or how the conflict affected ReliaStar's ultimate denial of benefits. (Rec. Doc. 24 at 24). Bergeron counters that ReliaStar's conflict is a significant factor, as evidenced by (1) ReliaStar's decision to ignore the evidence that Bergeron suffers from demyelinating disease; (2) Dr. Russell's failure to contact Dr. Erwin to discuss her diagnosis of demyelinating disease; (3) Dr. Russell's determination that Bergeron's disabling condition was due to somatoform disorder; (4) ReliaStar's "blatant avoidance" of analyzing the physical demands of Bergeron's job; and (5) a history of biased claims administration, as evidenced by *Romano v. ING ReliaStar Life Insurance*, 2013 WL 3448079 (D. Minn. 2013).

Bergeron fails to highlight any evidence that demonstrates how ReliaStar's conflict of interest impacted its ultimate claim denial, instead focusing on Dr. Russell's allegedly erroneous

decision. An administrator's denial of claims, a decision at odds with what Plaintiff alleges is definitive evidence, does not support a finding that a conflict of interest affected this decision. These conclusory allegations alone will not compel this Court to afford more weight to a conflict of interest. The claimant must present more evidence, such as the refusal to acknowledge a SSA award, to require this Court to weight the conflict of interest factor more heavily.

Bergeron cites *Romano v. ING ReliaStar Life Insurance* as evidence that ReliaStar has a history of biased claims, but that reliance is misguided. 12-CV-0137, 2013 WL 3448079 (D. Minn. July 9, 2013). The *Romano* Court granted Defendant ReliaStar summary judgment on the issue of whether the administrator fired Ms. Romano in retaliation for refusing to demand additional, and allegedly unnecessary, documentation from a claimant. *Id.* at 11-12. This holding therefore does not demonstrate a history of biased claims administration. In sum, because Bergeron fails to put forth any evidence that demonstrates how ReliaStar's conflict of interest affected its denial of Bergeron's case, the Court will consider the conflict of interest as a minimal factor.

**B. ReliaStar's Denial of Bergeron's Claim for Long Term Disability**

The Court must now apply this deferential standard to determine whether ReliaStar's denial of Bergeron's Long Term disability claim is "supported by substantial evidence and not arbitrary and capricious." *Corry*, 499 F.3d at 397-98. Under this standard, it is not necessary or permissible for this Court to diagnose the source of Bergeron's ailments, but rather, the Court's analysis is limited to the issue of whether ReliaStar's decision to deny Bergeron's benefits was arbitrary or capricious based on the record. Bergeron presents a number of arguments in support of his claim. Specifically, Bergeron contends that ReliaStar abused its discretion when it denied Bergeron's Long Term disability claim and when ReliaStar (1) applied the pre-existing condition

exclusion to Bergeron's claim for abdominal pain because treatment of non-specific symptoms does not trigger the exclusion; (2) concluded that Bergeron did not suffer from demyelinating disease in November 2011, or before or after that date; and (3) did not consider that somatoform disorder could constitute Bergeron's long term disabling condition. The Court will address each argument in turn.

***1.Abdominal Pain***

Bergeron argues that ReliaStar abused its discretion when it misapplied the pre-existing condition exclusion because Bergeron's treatment for abdominal pain was for a condition that doctors were unable to diagnose during the look-back period. (Rec. Doc. 22-1at 6-7). Bergeron cites a number of cases to support this proposition and avers that these cases stand for the notion that if a claimant's treatment is not *for* a specific condition, the treatment does not trigger the pre-existing condition exclusion. (Rec. Doc. 22-1 at 7). ReliaStar counters, arguing that Bergeron misapplies these cases because the claimants in those cases underwent "treatment for non-specific symptoms of an undiagnosed condition that was subsequently diagnosed." (Rec. Doc. 26 at 15).

This Court agrees with ReliaStar and finds that Bergeron misconstrues these cases and attempts to apply a broader rule than what the cases stand for. In *Lawson ex rel. Lawson v. Fortis Ins. Co.*, for instance, the Third Circuit found that the claimant did not qualify for the pre-existing exclusion condition when she had been treated for an upper respiratory tract infection and was ultimately diagnosed with leukemia. 301 F.3d 159, 165 (3d Cir. 2002). The Third Circuit noted that "for the purposes of what constitutes a pre-existing condition, it seems that a suspected condition without a confirmatory diagnosis is different from a misdiagnosis or an unsuspected condition manifesting non-specific symptom." *Id.* at 166. That case involved a

misdiagnosis and is distinguishable from the instant case, where Bergeron sought treatment for RUQ abdominal pain during the look-back period and then underwent numerous studies to determine the cause of the RUQ pain, ultimately electing to undergo procedures to remove a liver mass and his gallbladder to cure this pain. There was therefore no misdiagnosis, but rather, Bergeron presented for certain pain and continued along a treatment trajectory until he was ultimately diagnosed by the doctors for *that RUQ pain* and underwent surgical procedures that corrected the condition.

The other cases cited by Bergeron can also be distinguished from the instant case because the ultimate treatment or diagnosis in those cases turned out to be far removed from the treatment or diagnosis during the look-back period. *See Mitzel v. Anthem Life Ins. Co.*, 351 Fed. Appx. 74, 88 (6th Cir. 2009) (finding it "unreasonable" to deny a disability claim when the doctor during the look-back period "did not suspect, diagnose, or treat the specific disability for which she eventually applied for benefits."); *App v. Aetna Life Insurance Co.*, No. 4:08-CV-0358, 2009 WL 2475020 at *9 (MD. Pa. Aug. 11, 2009) (holding that there was no indication that during the look-back period that the doctor suspected the patient to be suffering from lupus or even considered the diagnosis).

In *Mcleod v. Hartford Life and Accident Ins. Co.*, the claimant saw a physician for numbness in her arm during the look-back period and ultimately received a diagnosis of MS. 372 F.3d 618 (3d Cir. 2004). As the Third Circuit noted, "[s]eeking medical care for a symptom of a pre-existing condition can only serve as the basis for exclusion from receiving benefits in a situation where there is some intention on the part of the physician or of the patient to treat or uncover the underlying condition which is causing the symptom." *Id.* at 628. The Third Circuit again distinguished between a "misdiagnosis" or of "unsuspected condition manifesting non-

specific symptoms" and a "suspected condition without a confirmatory diagnosis." *Id.* Bergeron's history falls into the latter category, as Bergeron continuously sought treatment for the RUQ abdominal pain during the look-back period, and throughout that time, his treating physicians attempted to diagnose the underlying condition that caused the RUQ pain. These facts differ from *Mcleod*, where the presentation of numbness did not propel the doctors on a course of treatment to cure that numbness that ultimately culminated in an MS diagnosis. Moreover, the broad rule proposed by Bergeron, that a failure to diagnose a claimant during the look-back period takes any treatment out of the pre-existing condition exclusion, is problematic. Such a broad rule would render most, if not all, of pre-existing exclusions meaningless.

Looking to the record, it is evident that Bergeron received treatment for RUQ abdominal pain during the look-back period. Specifically, Bergeron received treatment for this complaint during the look-back period, from August 2, 2011 until November 2, 2011:

- August 2, 2011: Bergeron underwent a high-resolution esophageal motility study (Bergeron_300);
- August 9, 2011: Bergeron visited Diane Dunston, a CFNP, with complaints of RUQ abdominal pain (Bergeron_271)
- August 15, 2011: Bergeron visited Dr. Nesheiwat for a follow-up visit and complained of RUQ abdominal pain (Bergeron_344).

Bergeron had also been treated for abdominal pain prior to the look-back period. (*See* Bergeron_ 372). Thus, based on the record, ReliaStar's determination that Bergeron's disability due to RUQ abdominal pain was excluded as a preexisting condition was based on substantial evidence and was not arbitrary or capricious.

2.***Demyelinating Disease***

Bergeron maintains that he qualifies for Long Term disability benefits due to demyelinating disease. He argues that ReliaStar's denial of benefits was not based on substantial evidence because the record overwhelmingly indicates that he suffered from demyelinating

disease in November 2011, and that because this disease was independent of his abdominal pain, it does not qualify for the pre-existing condition exclusion. Bergeron also avers that his symptoms went undiagnosed during the look-back period and that ReliaStar's reliance on Dr. Russell's IME was arbitrary or capricious because Dr. Russell failed to contact his treating physician, Dr. Erwin. Alternatively, Bergeron contends that he became afflicted during the period of time he received Short Term disability benefits.

ReliaStar counters and asserts that Bergeron's treating physicians at that time made no mention of any demyelinating disease symptoms and that Bergeron's disability claim failed to include these symptoms. ReliaStar also emphasizes that Bergeron's physicians, who allegedly treated him during the summer of 2012 for demyelinating disease, never recorded an unequivocal diagnosis and failed to supply ReliaStar with any neurological evidence for such a diagnosis. In fact, even now there is no definitive diagnosis of demyelinating disease.

The issue for this Court to determine is whether ReliaStar's conclusion that Bergeron did not suffer from demyelinating disease in November 2011 was arbitrary and capricious and not based on substantial evidence. The Court must remind itself that its decision is not based on de novo review, but rather the deferential standard of abuse of discretion. Moreover, the review is cabined by the administrative record. With this in mind, Bergeron must prove that he contracted demyelinating disease during his eight days of insurance coverage; or that his symptoms prior to that date were such that an ordinarily prudent person would not seek medical treatment; or that he presented with demyelinating disease symptoms prior to his coverage window but doctors misdiagnosed him. His claim was administratively denied. In his appeal, Bergeron must show that this conclusion was arbitrary and capricious. Based on the record, Bergeron does not satisfy this burden, and this Court finds that ReliaStar's determination was not arbitrary or capricious.

Bergeron contends that his demyelinating symptoms manifested during the eight days that he was eligible for insurance coverage, but the doctors' reports do not support that conclusion. Bergeron's treating physicians during and immediately after November 2011 did not systematically record symptoms of demyelinating disease and even went so far as to note that Bergeron did *not* display certain symptoms that Bergeron later claims prove his diagnosis. Dr. Adhvaryu, for instance, recorded on November 15, 2011 that Bergeron did not suffer from fatigue or joint swelling; showed no limitation of joint movement, confusion, or memory loss; and Bergeron's gait and eyes were normal. (Bergeron_369). Dr. Neshewiat saw Bergeron on December 2, 2011 and noted that Bergeron was "alert, oriented, cooperative[with] affect normal" and presented with a normal gait. (Bergerom_339). These observations undermine a finding that Bergeron experienced demyelinating symptoms at the time of his eligibility for disability. Although Bergeron claims many instances when he presented with symptoms of demyelinating disease (*See* Rec. Doc. 22-1 at 10-11), the record does not support his assertions and the contradictory evidence leads this Court to find that ReliaStar's decision rejecting coverage was based on substantial evidence and was not arbitrary or capricious.

Even if the Court afforded Bergeron's demyelinating claims absolute credence, this would not affect the ultimate outcome because Bergeron's alleged demyelinating symptoms would propel an ordinary person to seek medical treatment, and he did not. Specifically, the pre-existing condition exclusion applies if the claimant experienced symptoms that would "cause [ ] an ordinarily prudent person to seek diagnosis, care or treatment from a doctor or health care disability." (Bergeron_433). Bergeron claims that he had been "experiencing memory loss and cognitive difficulties for as long as *five years*." If so, ReliaStar could reasonably maintain that

that this would lead an ordinarily prudent person to seek medical attention and a failure to do so triggers the preexisting medical condition.

Bergeron counters this argument and asserts that he presented with demyelinating disease symptoms during the look-back period, prior to his eight-day window of coverage, but that his abdominal pain masked these symptoms and doctors therefore misdiagnosed him or did not treat him for those demyelinating disease symptoms. The case law discussed in the previous section provides some support for this argument. *See* pp. 21-23. Applying these cases, the contradictory record does not provide this Court with enough evidence to find that Bergeron presented with demyelinating disease symptoms prior to November 2011 that went untreated or misdiagnosed.

A definitive diagnosis that Bergeron currently suffers from demyelinating disease would provide this Court with a stronger record to find that Bergeron presented with symptoms in November 2011, but Dr. Erwin fails to make a conclusive diagnosis in her medical records. Dr. Erwin's letter to ReliaStar, dated December 18, 2012, relays that Bergeron was under Dr. Erwin's care for demyelinating disease of the central nervous system, but her medical records suggest that Dr. Erwin was simply monitoring Bergeron for that disease but had *not* affirmatively diagnosed Bergeron with demyelinating disease. For instance, in her notes for Bergeron's September 6, 2012 visit, Dr. Erwin recorded that Bergeron's "neurologic exam did not show any findings of concern…and there were no lesions that would lead to a definitive diagnosis of MS." (Bergeron_190). She went on to note that "[i]f new lesions are present, we will be able to make a diagnosis. If not, we will continue to follow the patient and treat him symptomatically." (Bergeron_190). In her notes from the December 6, 2012 visit, Dr. Erwin noted that Bergeron presented to the clinic for a "follow-up of his probable demyelinating disease." (Bergeron_197).

Dr. Erwin's records show that Bergeron did not display symptoms that Bergeron later highlights as dispositive of his demyelinating disease affliction. For instance, Bergeron's counsel alleges Bergeron's worsening gait, tremors, and impaired visions in his letter appealing ReliaStar's initial appeal denial on April 5, 2013. (Bergeron_83). But Dr. Erwin's physical exam notes from Bergeron's September 6, 2012 visit state Bergeron's "conjunctiva and sciera [of his eyes are] clear" and that Bergeron's gait was normal. (Bergeron_188). In her notes for the December 6, 2012 visit, Dr. Erwin recorded that Bergeron's gait was normal with no tremors and his "visual fields are full to visual confrontation." Such contradictory records convey that Dr. Erwin did not conclusively diagnose Bergeron with demyelinating disease by December 2012 and undermine any finding that Bergeron thus suffered from the disease prior to November 2011. Thus there is nothing in the record (and the Court is confined to the record) that supports the conclusion that a firm diagnosis of demyelinating disease has ever been made.

Focusing on ReliaStar's reliance on Dr. Russell's IME, Bergeron contends that Dr. Russell's assessment does not constitute substantial evidence because Dr. Russell failed to personally examine Bergeron or to contact Dr. Erwin. (Rec. Doc. 22-1 at 13-15). ReliaStar counters, arguing that ReliaStar is not required to give deference to Bergeron's treating physicians. (Rec. Doc. 24-1 at 24-25).

The Supreme Court has held that ERISA plan administrators are not required to afford special deference to claimant's treating physicians. *Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). Plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician…[but] courts may [not] impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* at 834. *See generally McDonald v.*

*Hartford Life Group Ins. Co.*, 361 Fed. Appx. 599, 611-12 (5th Cir. 2010) (rejecting claimant's argument that an ERISA plan abused its discretion when it adopted the reviewing physician opinions over the treating physicians' opinion and when the record supported both the treating and reviewing physician's opinions). In its decision, the Supreme Court highlighted the Secretary of Labor's view that "ERISA is best served by 'preserving the greatest flexibility possible for operating claims processing systems consistent with the prudent administration of a plan.'" *Id.* at 833 (quoting Department of Labor, Employee Benefits Security Administration, http://www.dol.gov/ebsa /faqs/faq_ claims_proc_ reg.html, Question B–4 (as visited May 6, 2003)).

Dr. Russell relied on and cited the record as support for his conclusions, thus demonstrating that he did not "arbitrarily" discredit Bergeron's reliable evidence. As held by the Supreme Court, there is no burden on the plan administrator to bestow deference to the treating physician's opinion, so Dr. Russell did not err when he addressed Dr. Erwin's opinion but did not defer to it when it conflicted with the entire record. Moreover, even if there was a diagnosis of demyelinating disease during the summer of 2012, that alone would not be dispositive of whether Bergeron was disabled due to this disease in November 2011 (eleven months prior to his seeking treatment with Dr. Erwin). Rather, the record must include evidence that Bergeron suffered from this disabling disease in November 2011, and as already noted, the record does not contain sufficient evidence to find ReliaStar's denial of such a finding arbitrary or capricious. As previously discussed, Dr. Erwin has not affirmatively diagnosed Bergeron with demyelinating disease. Therefore, Dr. Russell's determination that Bergeron did not suffer from demyelinating disease is not in conflict with the record, and ReliaStar's decision to rely on that determination does not constitute an abuse of discretion.

Finally, Bergeron argues that his coverage continued while he received Short Term disability benefits, and ReliaStar should have therefore considered whether he developed demyelinating disease between November 2011 and May 2012. This argument is misguided. Looking to the contract language, "a new period of disability begins if the new disability results from a cause or causes unrelated to that of any previous disability, *separated by active work* with the Policyholder." (Bergeron_433) (emphasis added). "Active work" occurs if "the employee is physically present at his or her customary place of employment with the intent and ability of working the scheduled hours and doing the normal duties of his or her job on that day." (Bergeron_431). Since Bergeron was on Short Term disability, and not physically present at work, he would not be eligible for Long Term disability if he developed demyelinating disease during the time period from November 2011 until May 2012, when he was receiving Short Term disability payments. ReliaStar therefore did not abuse its discretion for failing to consider that Bergeron may have become disabled while receiving Short Term disability benefits.

In sum, the record compels this Court to find that ReliaStar's determination that Bergeron did not present with demyelinating disease during his window of coverage or prior to that date was not arbitrary or capricious and was based on substantial evidence.

***3.Somoatform Disorder***

Finally, in Bergeron's Opposition to ReliaStar's motion, Bergeron argues that ReliaStar abused its discretion when it failed to consider that somatoform disorder constituted Bergeron's disabling condition. It is worth noting that this signifies the first time that Bergeron has contended that his disability is due to somatoform disorder and not demyelinating disease or something else. Indeed, Bergeron later denies in his Opposition that he suffers from somatoform disorder and offers Dr. Russell's determination as evidence of Russell's conflict of interest

because it is so at odds with the record. (Rec. Doc. 25 at 17). Furthermore, in Bergeron's letter to ReliaStar appealing ReliaStar's initial appeal denial, Bergeron's counsel stated "I have reviewed Dr. Stewart Russell's IME of February 4, 2013 and note that his opinion is inconsistent with the medical records. For example, Dr. Russell suggests that Mr. Bergeron's symptoms are due to somatoform disorder…." (Bergeron_82). This was in response to Dr. Russell's conclusion that"[i]t is highly likely that the insured is suffering from somatoform disorder…." (Bergeron_164). Dr. Russell's observation signifies the first time a physician had mentioned somatoform disorder as a possible diagnosis, and it was based on Dr. Dammers' impressions that Bergeron suffered from a pain disorder associated with a psychological medical condition. (Bergeron_217).

If Bergeron believed somatoform disorder caused his disabling condition, the burden was on Bergeron to supply ReliaStar with evidence to prove that this condition signified a disabling condition in November 2011. The Fifth Circuit has routinely held that an administrator has no burden to "to 'reasonably investigate a claim.'" *Truitt v. Unim Life Ins. Co. of America*, 729 F.3d 497, 511 (5th Cir. 2013) (quoting *Gooden v. Provident Life & Accident Ins. Co.*, 250 F.3d 331-33 (5th Cir. 2001)). Moreover, "[i]f the claimant has relevant information in his control, it is only inappropriate but inefficient to require the administrator to obtain that information in the absence of the claimant's active cooperation." *Id.* at 510 (quoting *Vega*, 188 F.3d at 298). Here, Bergeron *told* ReliaStar that his disability was *not* due to alleged somatoform disorder; much less provided evidence to support such a finding. ReliaStar's failure to consider whether the disability stemmed from somatoform disorder therefore does not constitute an abuse of discretion.

## IV. CONCLUSION

In short, the administrative record does not support Bergeron's claim that ReliaStar's denial of benefits was not based on substantial evidence and was arbitrary and capricious. The record compels this Court to find that the administrative finding that Bergeron's RUQ abdominal pain qualifies as a pre-existing condition, and did not signify a misdiagnosis, was not arbitrary or capricious. Bergeron's claim that he had symptoms of demyelinating disease, either during the eight-day eligibility window or prior to this period but were not such that a reasonable person would seek treatment, also fails to require a reversal of the administrative finding. The record does not support Bergeron's theory that he had demyelinating disease during the look-back period but doctors misdiagnosed it or the disease manifested as non-specific symptoms. Finally, the record does not substantiate a finding that ReliaStar's failure to consider whether somatoform disorder constituted Bergeron's disabling condition was arbitrary or capricious.

For the foregoing reasons, **IT IS ORDERED** that Plaintiff Dax Bergeron's Motion for Judgment Based on the Administrative Record (Rec. Doc. 22) is hereby **DENIED** and Defendant ReliaStar Life Insurance Company's Motion for Judgment Based on the Administrative Record (Rec. Doc. 24) is hereby **GRANTED**.

New Orleans, Louisiana this 15th day of January 2015.

Eldon E. Fallon

UNITED STATES DISTRICT COURT JUDGE